UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL TIEDEL,                          )
                    Plaintiff,           )
                                         )        No. 1:16-cv-1089
-v-                                      )
                                         )        Honorable Paul L. Maloney
RELIANCE STANDARD LIFE                   )
INSURANCE COMPANY,                       )
                    Defendant.           )
_____  )

## OPINION AND ORDER REVERSING DENIAL OF LONG TERM DISABILITY BENEFITS

Plaintiff Michael Tiedel was a full-time employee of Kalitta Air.  He worked as a flight engineer flying planes.  Kalitta Air offered a group disability benefits insurance plan which fell under the Employee Retirement Income Security Act (ERISA).  Defendant Reliance Standard Life Insurance Company (Reliance) administered and funded the plan.  Tiedel sought long-term disability benefits under the plan, which were denied by Reliance in a final decision issued on July 29, 2016.  Tiedel then filed this lawsuit.

I.

ERISA protects and promotes the interests of employees in employee benefit plans. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989).  ERISA allows employee participants to file civil actions seeking a review when the administrator denies benefits.  *See* 29 U.S.C. § 1132(a)(1)(B).  Ordinarily, a court will review the denial of benefits using the *de novo* standard.  *Firestone Tire and Rubber*, 489 U.S at 115.  Here, the parties agree the *de*

*novo* standard applies.  (ECF No. 12 Pl. Br. at 15 PageID.1794; ECF No. 20 Def. Br. at 12 PageID.1855.)

Applying the *de novo* standard, this Court's review is limited to the record before the plan administrator.  *Guest-Marcotte v. Life In. Co. of North America*, 730 F. App'x 292, 304 (6th Cir.  2018) (citing *Moore v. Lafayette Life Ins. Co.*, 485 F.3d 416, 430 (6th Cir. 2006)).  The plan administrator's decision is afforded no deference or presumption of correctness.  *Hoover v. Provident Life and Accident Ins. Co.*, 290 F.3d 801, 809 (6th Cir. 2002); *see Salve Regina Coll. v. Russell*, 499 U.S. 225, 238 (1991) ("When *de novo* review is compelled, no form of appellate deference is acceptable.").  This Court must take a "'fresh look' at the administrative record, giving proper weight to each expert's opinion in accordance with supporting medical tests and underlying objective findings[.]"  *Javery v. Lucent Techs., Inc. Long Term Disability Plan for Mgmt. or LBA Emps.*, 741 F.3d 686, 700 (6th Cir. 2014) (internal citation omitted).  Whether an insured is entitled to benefits is a factual question for which the insured bears the burden of proving by a preponderance of the evidence.  *See id.*

## II.

The Court first identifies the relevant provisions of the benefits plan (Plan) and then identifies the relevant evidence in the record.

## A.

The Plan identifies how an insured becomes eligible for monthly disability benefits. The insured (1) is Totally Disabled as the result of a Sickness or Injury covered by this Policy; (2) is under the regular care of a Physician; (3) has completed the Elimination Period; and

(4) Submits satisfactory proof of Total Disability to us. (ECF No. 9-1 PageID.55.) Reliance does not argue that Tiedel failed to meet the second and third elements. The dispute is whether Tiedel is totally disabled and whether he submitted sufficient evidence to show his disability.

The Plan defines "Total Disability." As the result of an injury or sickness, (1) during the Elimination Period and for the first 12 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her Regular Occupation . . . ; and (2) after a Monthly Benefit has been paid for 12 months, an Insured cannot perform the material duties of Any Occupation. (*Id.* PageID.48.) The Plan also defines "Any Occupation" as "an occupation normally performed in the national economy for which an Insured is reasonably suited based upon his/her education, training or experience." (*Id.* PageID.47.) The Plan requires the insured to provide written proof of the total disability. (*Id.* PageID.52.) Reliance does not deny that Tiedel cannot perform his job as a flight engineer. Reliance argues that Tiedel is not so disabled that he cannot perform the material duties of any occupation. (ECF No. 20 Def. Br. at 16 PageID.1859 "While it is undisputed that Plaintiff could not return to work in his previous occupation, Plaintiff's medical records . . . do not proved any evidence that would not allow Plaintiff to return to a sedentary exertion occupation . . . .").

### B.

Tiedel's early medical history was summarized by Richard Ilka, M.D., the doctor who conducted the first independent medical examination (IME) requested by Reliance. In January 1979, Tiedel was in the pilot seat of a single engine plane that crashed. (ECF No. 9-

7 PageID.753.)  Tiedel suffered fractures in his thoracic and lumbar spine and had to have surgical reconstruction of his facial bones.  (*Id.*)  In 2001, Tiedel was diagnosed with hepatitis C, which he likely contracted when he received blood transfusions after the accident in 1979. (*Id.* PageID.754.)  In December 2013, Tiedel's hepatitis C symptoms recurred and his viral load increased markedly.  (*Id.*)

The recurrence of hepatitis C affected Tiedel's ability to fly planes.  On or around March 17, 2014, Tiedel could not complete a flight simulation.  (ECF No. 9-6 Email PageID.591.)  Several days later, on March 21 and 22, Tiedel could not pass a requalification exam.  (*Id.* PageID.590.)  In its claim file, Reliance indicates that, on April 14, 2014, a phlebotomy test confirmed the recurrence of hepatitis C and that Tiedel was experiencing weight loss, fatigue, memory lapses, joint pain and fluctuating blood pressure.  (ECF No. 9-2 PageID.109.)  In June 2014, Tiedel began a 12-week treatment for hepatitis C using three anti-viral medications, two of which are taken daily and one taken weekly.  (ECF No. 9-5 PageID.359-60.)  On August 22, 2014, as part of a grievance process, Tiedel's treating physician, Paul Wagner, D.O. wrote a letter connecting the recurrence of hepatitis C to Tiedel's work performance.  (ECF No. 9-7 PageID.651-52.)  Tiedel experienced side effects from the hepatitis C medications and from the medications he was taking to control his hypertension, including dizziness, fatigue and tunnel vision.  (*Id.* PageID.651.)  The onset of the hepatitis C, and the side effects of the medications, likely interfered with Tiedel's ability to perform and complete his training.  (*Id.*)  Dr. Wagner recommended that Tiedel voluntarily relinquish his flying privileges until his health improved, which Tiedel did.  (*Id.*)

Tiedel initially obtained both short-term and long-term disability benefits. On July 3, 2014, Tiedel was approved for short-term disability benefits, with the onset of his disability identified as March 18, 2014. (ECF No. 9-5 PageID.370.) On December 22, 2014, Tiedel was approved for long-term disability benefits, with the onset of his disability identified as March 15, 2014. (ECF No. 9-4 PageID.182.) The letter informed Tiedel that his benefits hinged on remaining totally disabled. (*Id.*) On January 30, 2015, Tiedel's long-term benefits were extended through February 17, 2015. (*Id.* PageID.186.)

Tiedel lost his long-term disability benefits for the first time on March 10, 2015 (ECF No. 9-4 PageID.188-91), a decision later reversed on September 29, 2015. The letter informed Tiedel that his medical records did not support the conclusion that he could not perform the material duties of his own occupation. (*Id.* PageID.189.) The letter did not identify any of Tiedel's duties as a flight engineer. The letter explained that a Vocational Rehabilitation Specialist reviewed the file and determined that Tiedel's duties constituted "light work," meaning that he had to frequently walk and stand and would occasionally have to lift or push up to 20 pounds. (*Id.*) The letter also noted that Dr. Wagner had not provided any evidence of treatment, lab results or a physical exam. (*Id.* PageID.190.)

Tiedel filed an appeal of the denial of long-term benefits and later hired counsel. Reliance obtained an IME report of Tiedel through Dr. Ilka. (ECF No. 9-7 PageID.751-84.) Dr. Wagner wrote a letter (Physician Statement of Disability), dated September 4, 2014, attesting that Tiedel is "totally and permanently disabled from his employment as a Flight Engineer and any other full time occupation at this time." (ECF No. 9-9 PageID.1134.) On September 29, 2015, counsel received a letter stating that the earlier decision to terminate

benefits was reversed.  (ECF No. 9-10 PageID.1478.)  The letter offered no explanation for the decision.  The claim was referred back to the same individual who made the earlier decision to terminate benefits.  (*Id.*)

The record shows that Tiedel's treatment for hepatitis C was successful.  (ECF No. 9-7 PageID.704.)  In a letter to Dr. Wagner dated March 30, 2015, a nurse with the Hepatitis Clinic states that Tiedel started his 12-week regimen in June 2014.  Six months later, Tiedel had an undetectable viral load, which the Clinic considers "a viral cure." (*Id.*)  Tiedel showed no evidence of advanced fibrosis and "no longer needs follow up for his hepatitis C." (*Id.*)

On October 22, 2015, Tiedel lost his long-term disability benefits for the second time.  (ECF No. 9-4 PageID.204-07.)  This time, the claim specialist concluded that the medical records did not support the conclusion that Tiedel could not perform the material duties of any occupation.  (*Id.* PageID.204-05.)  The claim specialist found that the medical records established that Tiedel was capable of "sedentary work," meaning that he could occasionally exert up to 10 pounds of force and could work while seated, with occasional standing and walking.  (*Id.* PageID.205.)  The claim specialist noted that Tiedel's education, training and experience provided him with transferrable skills, including: (1) converting technical ideas into working drawing, (2) using complex math formulas, (3) writing clearly and with technical accuracy, (4) using drafting tools or measuring instruments with coordination of eyes, hands, and fingers, and (5) maintaining a high level of accuracy.  (*Id.* PageID.206.)  As an example, the claim specialist identified Aircraft Log Clerk as an occupation Tiedel could perform.

(*Id.*)  The claim specialist relied on a Residual Employability Analysis Report authored by Carol Vroman.[1]  (9-9 PageID.1167-80.)

Tiedel filed another appeal.  Both parties obtained additional reports concerning Tiedel's physical and mental abilities.   As part of his appeal Tiedel submitted a neuropsychological opinion from a licensed psychologist, Steven Harris, Ed.D.  (ECF No. 9-11 PageID.1732-35.)  Harris examined Tiedel on two occasions and administered both physical and written tests.  Tiedel submitted a Vocational Rehabilitation Evaluation from a certified rehabilitation counselor, Robert Ancell, Ph.D.  (ECF No. 9-11 PageID.1539-54.) Tiedel also submitted notes from an ear nose and throat (ENT) examination in March 2016 relating to his continued balance issues.  (ECF No. 9-10 PageID.1485-87.)  The document indicates Tiedel would be treated for "imbalance" and for "mild high frequency hearing loss." (*Id.* Page ID.1487.)  Reliance asked Tiedel to sit for a second IME, this time with Shlomo Mandel, M.D., who provided a report.  (ECF No. 9-11 PageID.1747-59.)  Reliance also submitted a file review from Elana Mendelssohn, Psy.D, a licensed psychologist who reviewed Harris's opinion.  (ECF No. 9-11 PageID.1765-70.)

On July 29, 2016, counsel received a letter affirming the denial of long-term disability benefits.  (ECF No. 9-4 PageID.215-223.)  Reliance concluded that Tiedel was "capable of performing *Any Occupation*, and is therefore no longer *Totally Disabled* in accord with the Policy."  (*Id.* PageID.223 italics in original.)

---

[1]        The record contains two reports, one dated October 7, 2015 and the other dated October 8, 2015.  It is not immediately clear how the two reports differ, other than the date.

III.

In this section, the Court analyzes the relevant evidence in light of the terms of the Plan. The inquiry is whether Tiedel has established, by a preponderance of the evidence, that he cannot perform the duties of Any Occupation, as that term is defined in the Plan. For this inquiry, the Court assumes Tiedel can physically perform sedentary work. The relevant date for the determination is September 17, 2015, twelve months after Tiedel began receiving long-term disability payments. (ECF No. 9-4 PageID.204-05; ECF No. 9-4 PageID.217.)

A.

The Court considers the letters, opinions and reports from Wagner, Ilka, Mandel, Ancell, Vroman, Harris and Mendelssohn.[2] The Court generally discusses the documents in chronological order because the authors frequently refer to the earlier writings.

As Tiedel's long-time treating physician, Dr. Wagner should be familiar with Tiedel's medical situation and this Court would ordinarily afford his opinion greater weight. The record includes at least three letters from Wagner: (1) August 22, 2014 (ECF No. 9-7 PageID.650-51); (2) May 4, 2015 (ECF No. 9-7 PageID.680-81); and (3) September 4, 2015 (ECF No. 9-9 PageID.1134). The August 2014 letter identifies medical reasons why Tiedel could not pass the flight simulation. In addition to the symptoms from the recurrence of hepatitis C, the drugs used to treat hepatitis C and the drugs used to treat Tiedel's

---

[2]   Judy Barach's vocational opinion issued September 15, 2015, is not discussed. (ECF No. 9-9 PageID.1159-60.) She concludes that Tiedel could not perform the duties of his regular job as a flight engineer.

hypertension produced side effects that prevented him from working.  The May 2015 letter was a response to first termination of long-term disability benefits.  Without detail, Wagner simply asserts that Tiedel suffers from residual ailments from his 1979 accident and underlying ailments related to hepatitis C.  In his Physician Statement of Disability issued on September 4, 2015, Wagner identifies Tiedel's diagnoses and concludes Tiedel is totally and permanently disabled from full time work.

The Court affords little weight to the three letters from Dr. Wagner.  The letters provide no medical insight as to Tiedel's ability to perform the duties of Any Occupation as of September 17, 2015.  The first letter assumes the symptoms of recurring hepatitis C and the side effects of taking the drugs, two events that were resolved by September 17, 2015.  The second letter makes vague references to residual and underlying ailments.  To the extent those ailments or symptoms existed prior to the Hepatitis C recurrence, they did not affect Tiedel's ability to work as a flight engineer.  By implication, the residual and underlying ailments should not affect Tiedel's ability to perform sedentary work, work that would be less taxing than light work.  The second letter does not suggest that Tiedel suffers from some injury related to his latest treatment for hepatitis C.  The third letter lists five medical diagnoses, none of which have medical support in the record sufficient to disable Tiedel from performing sedentary work.  The record contains no evidence that, as of September 17, 2015, on-going hepatitis C symptoms rendered Tiedel incapable of sedentary work.  The drug regimen was successful and had been discontinued.  The record contains no medical evidence to show Tiedel cannot perform sedentary work because of hemochromatosis or

osteoarthritis of the back.[3]  Neither prevented Tiedel from performing his duties as a flight instruction prior to March 2014 and the record does not contain evidence that the ailments worsened between March 2014 and September 2015.  Tiedel's fibrosis of the liver did not disable him prior to March 2014 and the record contains evidence that the recurrence of hepatitis C did not make render the fibrosis "advanced."  Finally, the record contains no evidence that Tiedel's hypertension has rendered him incapable of sedentary work.[4]  Dr. Wagner's conclusion that Tiedel is "totally and permanently" disabled is, at best, a medical opinion unsupported by any medical evidence on this record or, at worst, a legal opinion entitled to no weight.

Dr. Ilka performed the initial IME on Tiedel.  The report issued in July 2015.  (ECF No. 9-7 PageID.751-84.)  Ilka examined Tiedel and reviewed Tiedel's medical files.  Ilka reported that Tiedel complained about sporadic episodes of loss of balance and widespread musculoskeletal pain.  (*Id.* PageID.751-52.)  The episodes would last 10 to 20 minutes and were decreasing in frequency.  (*Id.* PageID.752.)  The loss of balance problems began when Tiedel started the drug regimen for hepatitis C.  (*Id.* PageID.754.)  Tiedel also reported feeling "mentally foggy" after receiving the treatment.  (*Id.* PageID.752.)  The treatment did not cause a worsening of Tiedel's musculoskeletal pain, which has persisted since 1979.  (*Id.* PageID.755.)  Ilka found no medical limitations based on hepatitis C and no new limitations based on Tiedel's musculoskeletal pain.  (*Id.* PageID.780-81.)  Ilka concluded that Tiedel

---

[3]      Dr. Ilka notes that Tiedel's medical records call into question whether he actually has hemochromatosis or whether the high iron in Tiedel's blood is due to a problem with his liver.  (ECF No. 9-7 PageID.779.)  The cause of the iron imbalance is likely not a material dispute.
[4]      Dr. Ilka notes that Tiedel's medical records show that Tiedel's hypertension has been effectively treated.  (ECF No. 907 PageID.780.)

had not had a "direct evaluation" for the dizzy spells "which could be disabling and disqualifying him from resuming flight duties." (*Id.* PageID.781.)

The Court affords little weight to Dr. Ilka's report. Ilka identifies a number of details in Tiedel's medical file about the treatments he received after the recurrence of hepatitis C, details that are not included in Dr. Wagner's letters. Dr. Ilka's medical opinions, however, are largely unhelpful to the inquiry. Dr. Ilka was asked about Tiedel's ability to work a flight engineer. Ilka concluded that Tiedel needed to have the dizzy spells evaluated.

Carol Vroman wrote her Residual Employability Analysis on October 7, 2015. (ECF No. 9-9 PageID.1167-73.) Vroman relied on Ilka's report to conclude that Tiedel was capable of sedentary work. Vroman also identified the transferrable skills that Tiedel had based on his education, training and experience. Vroman found that a Tiedel could likely perform the duties of an aircraft log clerk.[5] On this record, the Court finds that the upper end of Tiedel's physical abilities would be sedentary work. Vroman's report constitutes the best evidence to support Reliance's conclusion that Tiedel remained capable of performing the duties of some other, less taxing, occupation.

Psychologist Steven Harris wrote his report in April 2016. (ECF No. 9-11 PageID.1732-35.) Tiedel was referred to Harris for a "neuropsychological examination relative to complaints of neurocognitive dysfunction, with associated diagnosis of Post Traumatic Headache, onset 5/21/2015, as well as complaints of disturbed balance with

---

[5]     Vroman did not consider whether any aircraft log clerk jobs were available. In his report, Ancell found that there were not open aircraft log clerk jobs available in the State. (ECF No. PageID.)

vertigo, spatial disorientation, dizziness, and impaired short-term memory." (*Id.* PageID.1732.)  Harris met with Tiedel on March 23 and April 8, 2016.  (*Id.*)  In addition to a clinical interview, Harris conducted six texts: (1) California Verbal Learning Test, (2) Halstead Category Test, (3) Finger Oscillation Test, (4) Grip Dynamometer Test, (5) Grooved Pegboard Test, and (6) Paced Auditory Serial Addition Test.  (*Id.*)  Harris concluded

> [Tiedel's] test results do provide objective evidence of impaired speed of information processing, divided attention, short-term recall, and executive function.  This is apparent in his inability to adequately problem solve, to engage in cognitive set-shifting, and to anticipate consequences of his actions . . . . In summary, it is this clinician' opinion that Mr. Tiedel does suffer from neurocognitive dysfunction, as outlined in the body of this report, . . . .  He does not present clinically with evidence of depression or anxiety at this time, and certainly the results of this neurocognitive examination cannot be explained on the basis of psychogenic factors.  It is this clinician's opinion that these test scores represent underlying organic pathology in this gentleman, with a corresponding diagnosis of Cognitive Disorder Not Otherwise Specified, and a global level of functioning at 48.

(*Id.* PageID.1735.)

The Court affords some weight to Harris' conclusions.  Harris met with Tiedel twice. He reviewed Tiedel's medical records.  Harris conducted several different physical and mental examinations on Tiedel and was able to observe Tiedel during those examinations. Harris ties his conclusions to his observations, his review of the medical records and to the results of the different examinations.

Robert Ancell issued his Vocational Rehabilitative Evaluation on April 12, 2016. (ECF No. 9-11 PageID.1539-54.)  According to Ancell, Tiedel's dizziness episodes were markedly worse than what Tiedel reported to Ilka nine months earlier.  Ancell writes that

Tiedel reported that he falls once or twice a day, experiences vertigo and pain and suffers short-term memory problems. (*Id.* PageID.1539.) Tiedel's elbow, knees, legs and toes "lock up." (*Id.*) He also experiences "'chemo brain' symptoms that affect his cognition and behavior." (*Id.* PageID.1540.) Ancell wrote an extensive summary of Tiedel's medical history. Ancell concluded that Tiedel "has sustained significant vocationally limiting problems." (*Id.* PageID.1554.) Ancell found that Tiedel's "neuropsychological findings along with the recent ENT findings of vertigo objectively document his inability to perform any gainful employment." (*Id.*)

The Court affords some weight to Ancell's report. Ancell did not examine Tiedel; he conducted an extensive file review. Ancell does offer some useful insight by identifying omissions or errors in some of the earlier reports, such as the job description contained in Barach's report. (*Id.* PageID.1551-52.) At times Ancell simply speculates. For example, Ancell opines that if Vroman had access to Harris's neuropsychological test results, her conclusions would have been different. (*Id.* PageID.1552.) Ancell's report does contain at least one ambiguous statement of import. Ancell states that the ENT report "diagnosed" Tiedel with imbalance issues. (*Id.* PageID.1553.) The ENT report identifies imbalance as an "impression," an initial opinion. (ECF No. 9-10 PageID.1487.) Because Ancell's conclusions are based on a more complete record than the earlier Vroman and Barach assessments, and because Ancell attempts to answer the any occupation question, the Court finds Ancell's opinions useful.

Dr. Mandel conducted the second IME on Tiedel. Mandel examined Tiedel on June 16 and submitted his report on June 20, 2016. (ECF No. 9-11 PageID.1747.) The

examination lasted approximately 30 minutes and Mandel reviewed Tiedel's medical records for approximately 45 minutes.  (*Id.* PageID.1755.)  According to Mandel, Tiedel's chief complaint was "post treatment effects."  (*Id.* PageID.1747.)  Mandel provides an abbreviated summary of Tiedel's medical history.  Mandel states that his "diagnostic impression" was that the records contain "no indication of hepatic encephalopathy based on clinical findings or laboratory studies."[6]  (*Id.* PageID.1754.)  In response to Reliance's specific questions, Mandel wrote that "there is no medical data to support the presence of complaints, as detailed above" and that Tiedel's "complaints are not consistent with the examination findings and laboratory results[.]"  (*Id.* PageID.1755.)  Later, Mandel provided a more detailed answer to Reliance's question about "the presence or absence of an impairment as of September 17, 2015."  (*Id.* PageID.1756.)  Mandel concluded that Tiedel was not impaired.  "[T]he absence of impairment is based on the lack of objective evidence linking his subjective complaints to liver dysfunction."  (*Id.*)  Mandel then summarized that "it is my opinion that Mr. Tiedel is not significantly restricted or limited by the effects of his hepatitis C treatment."  (*Id.*)

---

[6]      Hepatic encephalopathy (HE) refers to "a spectrum of neuropsychiatric abnormalities in patients with liver dysfunction, after exclusion of brain disease."  David Wolf, *Hepatic Encephalopathy*, Medscape (Apr. 8, 2020, 8:45 a.m.), https://emedicine.medscape.com/article/186101-overview; *see, e.g., Jacobs v. Northern King Shipping Co., Ltd.*, 180 F.3d 713, 716 (5th Cir. 1999) ("Jacobs confused and disoriented state on board the M/T MARINA was consistent with hepatic encephalopathy, a neurological condition related to his liver condition.").  HE occurs when the liver does not remove toxins from blood, allowing the toxins to accumulate which affects the brain's ability to function well.  WebMD, *What Is Encephalopathy?*, (Apr. 8, 2020, 9:15 a.m.), https://www.webmd.com/brain/what-is-encephalopathy#1; *see Berger v. Manhattan Life Ins. Co.*, 805 F. Supp., 1097, 1101 (S.D.N.Y. 1992) ("[H]e was suffering from hepatic encephalopathy, a liver disorder exhibited by neural effects on the brain resulting from accumulation of blood toxins not cleared by a malfunctioning liver[.]").

The Court gives little weight to Mandel's opinion.  Mandel opines that Tiedel's medical records do not include evidence to support a connection between Tiedel's complaints and liver disease.  This conclusion must be put in context.  The lack of evidence could be explained at least two ways.  First, Tiedel could have been tested for liver dysfunction and the test results were negative.  Such records would be compelling evidence of an absence of an impairment.  However, Mandel does not point to any testing or results in Tiedel's medical records which would show that, after the hepatitis C treatment, Tiedel's liver is functioning normally.  Alternatively, Tiedel might not have been tested for liver dysfunction.  This alternative situation, which appears to be the correct state of Tiedel's medical records, would not be compelling evidence of the absence of an impairment.  Because Tiedel has not been tested for liver dysfunction, the absence of evidence is not evidence of absence of an impairment.  At best, Mandel's report establishes that Tiedel has not come forward with evidence of a liver dysfunction following his treatment for hepatitis C.

Elana Mendelssohn authored her report on July 15, 2016.  (ECF No. 9-11 PageID.1765.)  Mendelssohn conducted a file review of Tiedel's medical records for the purpose of opining whether Tiedel suffered from cognitive impairments.  She noted that the two IMEs were primarily for the purpose of evaluating Tiedel's physical condition and that neither IME contained observations of cognitive or emotional difficulties.  (*Id.* PageID.1768.)  Mendelssohn wrote that Harris "administered a small number of measures as opposed to a comprehensive assessment."  (*Id.*)  She dismissed Harris's conclusions because he "did not take into account the limited testing completed and the absence of

symptom validity measures." (*Id.*)   Mendelssohn also discounted Ancell's conclusions because Ancell relied on Harris's assessment.  (*Id.*)  Mendelssohn found "no conclusive evidence to substantiate the presence of cognitive impairment as of 09/17/2015." (*Id.*)

On July 20, 2016, Mendelssohn spoke with Harris about his testing and conclusions and authored a supplemental report on July 22.  (*Id.* PageID.1769-70.)  Mendelssohn asked Harris if he had "utilized formal symptom validity measures in his evaluation." (*Id.* PageID.1769.)  Harris did not, explaining that Tiedel's "appearance was consistent with the referral and subjective complaints." (*Id.*)  Furthermore, Harris reported to Mendelssohn that Tiedel appeared jovial and talkative, "was not calculated in his responses, became frustrated on certain tasks, and appeared to try hard on tasks." (*Id.*)  As a result, Harris "did not feel it was necessary to administer additional measures." (*Id.*)  The discussion with Harris did not change Mendelssohn's opinion because "it would still remain unknown if findings were valid." (*Id.*)  She noted that the two IME doctors "did not detect the presence of a cognitive disturbance." (*Id.*)  She summarized that it "remains my opinion that the evaluation was limited, and overall, the information does not provide consistent medical data to substantiate functional impairment." (*Id.*)

The Court affords little weight to Mendelssohn's conclusions.  First, to the extent Mendelssohn found important that neither IME report included observations of a cognitive disturbance, her concern is misplaced.  As she noted, neither doctor was asked to examine Tiedel for cognitive impairments. This Court already discussed how a lack of evidence, in this case an observation by a doctor that Tiedel exhibited cognitive dysfunction, is not necessarily evidence that Tiedel lacked cognitive impairments.  Having reviewed the two

reports again, Dr. Ilka's report was sufficiently comprehensive that the Court would expect Ilka to have included such observation if he had one. Dr. Mandel's report, on the other hand, addressed only Tiedel's physical abilities and the Court would not expect Mandel to have included such observation.

More problematic are Mendelssohn's conclusions about the tests administered by Harris. Mendelssohn fails to explain why the six tests Harris administered were "limited" and were not a "comprehensive assessment." The explanation may be patently obvious to another psychologist, but it is not obvious to the Court. Mendelssohn does not identify what tests should have been include but were not. Neither does she explain why the six tests that were performed provided an incomplete or imperfect set of data. Similar to the Court's dismissal of Dr. Wagner's assertion that Tiedel is totally and permanently disabled (trust me, I'm his doctor), the Court cannot give weight to Mendelssohn's assertion that Harris's battery of tests were too limited to be useful (trust me, I'm a psychologist).

Mendelssohn's concerns about the validity of Harris's tests and conclusion are also problematic. When Mendelssohn asked Harris why he did not use formal validity measures, Harris explained that he did not deem the validity measures necessary. Harris, who interacted with Tiedel over two different sessions, concluded that Tiedel was credible. In Harris's opinion, Tiedel was not trying to undermine the tests. Mendelssohn, who never met Tiedel, discounted Harris's explanation. While insurers may ordinarily rely on a file review, when the file reviewer's conclusion necessarily rely on a credibility determination, as which occurred here, "reliance on such a review may be inadequate." *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 297 n.6 (6th Cir. 2005); *see Bennett v. Kemper Nat'l Servs., Inc.*, 514

F.3d 547, 555 (6th Cir. 2008) ("Further, we will not credit a file review to the extent that it relies on adverse credibility findings when the files do not state that there is a reason to doubt the applicant's credibility.").

B.

On this record, as of September 17, 2015, Tiedel could no longer perform the duties of Any Occupation.  Accordingly, Reliance should have awarded him long-term disability benefits.  Tiedel submitted objective medical evidence, Harris's report, establishing that he suffers cognitive impairments that affect his abilities.  Tiedel has also submitted an expert opinion, Ancell's report, which establishes that Tiedel could not obtain gainful employment in his current condition.  These reports provide sufficient evidence to establish that Tiedel could not perform even sedentary work.  Reliance's evidence does not sufficiently undermine this conclusion.  Dr. Mandel addresses only whether the record contains evidence to show that Tiedel has liver problems which would explain the cognitive dysfunction.  But, Tiedel has not been tested for liver dysfunction following his hepatitis C treatment.  Mandel does not address Harris's report or Harris's conclusions, at least regarding Tiedel's cognitive abilities.  Mendelssohn's takes issue with Harris's testing and his conclusions, but she fails to sufficiently explain her concerns about the number and quality of the tests.  Mendelssohn's concerns about the validity of Harris's tests necessarily calls Tiedel's credibility into doubt.  But, Mendelssohn conducted a file review only and, under binding precedent, her concerns about Tiedel's credibility are not entitled to any weight when the examiner reached a different conclusion about Tiedel's credibility.

IV.

Plaintiff Michael Tiedel cannot perform the duties of any occupation, as that term is defined in his disability insurance plan.  Accordingly, Tiedel is entitled to long-term disability benefits.  Tiedel has put forth sufficient evidence to show that he suffers from cognitive impairments that disqualify him from sedentary work.  He offered objective medical evidence to show a cognitive impairment and expert opinion evidence that the impairments prevent him from working.  The evidence offered by Defendant Reliance Standard Life Insurance does not undermine Tiedel's evidence.

**<u>ORDER</u>**

For the reasons provided in the accompanying Opinion, the Court declares that, as of September 17, 2015, Tiedel was entitled to long-term disability benefits under the terms of the group benefits plan administered by Reliance Standard Life Insurance.  The July 29, 2016, decision denying benefits is **REVERSED.  IT IS SO ORDERED.**

Date:  April 15, 2020                                    /s/ Paul L. Maloney
                                                                Paul L. Maloney
                                                                United States District Judge